IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| ELECTROCRAFT ARKANSAS, INC., | * | |
| | * | |
| Plaintiff, | * | |
| vs. | * | No. 4:09cv00318 SWW |
| | * | |
| | * | |
| SUPER ELECTRIC MOTORS, LTD and | * | |
| RAYMOND O'GARA, INDIVIDUALLY | * | |
| AND AS PARTNER AND AGENT OF | * | |
| SUPER ELECTRIC MOTORS, LTD, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM AND ORDER

Electrocraft Arkansas, Inc. (Electrocraft) brings this action against Super Electric Motors, LTD (Super Electric) asserting the following claims in connection with allegedly defective refrigerator motors that Electrocraft purchased from Super Electric: violations of the United Nations Convention on Contracts for the International Sale of Goods (CISG); violations of Article 2 of the Uniform Commercial Code (UCC), codified in Ark. Code Ann. §§ 4-2-101 *et seq*.; breach of express warranty; breach of implied warranty of merchantability; negligence/strict liability; violations of the Arkansas Deceptive Trade Practices Act (ADTPA), codified in Ark. Code Ann. §§ 4-88-101 *et seq*.; tortious interference with a business expectancy; and unjust enrichment and restitution.[1] Super Electric has counterclaimed against Electrocraft under the CISG and seeks judgment against Electrocraft for unpaid invoices in the amount of $1,126,077.92 and lost profits in excess of $1,000,000.

The matter is before the Court on motion of Super Electric to dismiss Electrocraft's

---

[1] Separate defendant Raymond O'Gara has been voluntarily dismissed from this action.

complaint [doc.#4]. Electrocraft has responded in opposition to Super Electric's motion and Super Electric has filed a reply to Electrocraft's response. For the reasons that follow, the Court grants in part and denies in part Super Electric's motion to dismiss.

I.

Electrocraft is a Delaware corporation doing business in the State of Arkansas and supplies electric refrigerator motors to manufacturers of refrigerators. Super Electric is a company engaged in the manufacture of refrigerator motors. Super Electric was formed under the laws of Hong Kong and its manufacturing facilities are located in Shenzhen, China.

Electrocraft states it has been purchasing refrigerator motors from Super Electric since approximately 2002 and that the motors were able to be utilized for their intended purpose after being inspected by Electrocraft. The motors would then be delivered to Electrocraft's customers, including Whirlpool and other manufacturers.

Electrocraft states that in July 2008, it began to receive notices from its customers that the motors supplied by Super Electric were failing at an unacceptable rate. Electrocraft states that it confirmed there were incurable problems with the motors as a result of manufacturing defects and that due to their failure to operate in the intended fashion, the defective motors have been returned to Electrocraft by the end user, causing Electrocraft to be unable to fulfill its contractual obligations to its customers. Electrocraft states it is currently in possession of approximately 300,000 defective motors manufactured and delivered by Super Electric without having any productive use.

Electrocraft states that representatives of Super Electric confirmed that the motors were

defective but still demanded payment for the motors that had been delivered. Electrocraft states that despite demand, Super Electric has been unwilling or unable to cure the situation, to refund for paid invoices, or to void the unpaid invoices for the defective motors, and that Super Electric has caused it damage by way of the loss of existing customers, being forced to pay significant amounts to resolve customer claims and remedy customer complaints, and damage to its business reputation.

II.

Super Electric moves to dismiss Electrocraft's complaint on the following grounds: (1) count one of Electrocraft's complaint, asserting violations of the CISG, does not set forth sufficient facts to state a claim upon which relief can be granted under the CISG; (2) the CISG preempts and subsumes the breach of warranty claims contained in counts two and three of Electrocraft's complaint; (3) the CISG preempts and subsumes the negligence/strict liability claim in count four of Electrocraft's complaint; (4) the ADTPA claim in count five of Electrocraft's complaint is preempted by the CISG and must in any case be dismissed as the ADTPA applies only to actions brought by consumers; (5) the tortious interference with business expectancy claim in count six of Electrocraft's complaint is preempted by the CISG and Electrocraft additionally cannot plead facts to meet the elements of such a cause of action; and (6) the unjust enrichment and restitution claims in count seven of Electrocraft's complaint are preempted and subsumed by the CISG and, moreover, such claims under Arkansas law are not cognizable in circumstances in which the parties' rights and remedies are borne of a contract.

A.

In reviewing a motion to dismiss, the Court must accept as true all factual allegations in the complaint, but is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, — U.S. — , 129 S.Ct. 1937, 1950 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 1949. "Nor does a complaint suffice if it "tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. (quoting *Twombly*, 550 U.S. at 557). To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, — U.S. — , 129 S.Ct. at 1949. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 556). A well-pleaded complaint may proceed even if it appears that actual proof of those facts is improbable and that recovery is very remote and unlikely. *Twombly*, 550 U.S. at 556. A complaint cannot, however, simply leave open the possibility that a plaintiff might later establish some set of undisclosed facts to support recovery. *Id.* at 561. Rather, the facts set forth in the complaint must be sufficient to nudge the claims across the line from conceivable to plausible. *Id*. at 570. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, — U.S. — , 129 S.Ct. at 1950 (quoting Fed.R.Civ.P. 8(a)(2)).

B.

1.

The Court first addresses application of the CISG to this action. The CISG is an international treaty, ratified by the United States in 1986, that sets out substantive provisions of law to govern the formation of international sales contracts and the rights and obligations of the buyer and seller. *Caterpillar, Inc. v. Usinor Industeel*, 393 F.Supp.2d 659, 673 (N.D.Ill. 2005) (citation omitted). The aim of the CISG is to promote worldwide uniformity in dealing with sales disputes arising from international sales. Peter Schlechtriem, *The Borderland of Tort and Contract: Opening a New Frontier?*, 21 Cornell Int'l L. J. 467, 472 (1988). The CISG applies to international sales contracts between parties that are located in signatory countries, and who have not opted out of CISG coverage at the time of contracting. *Caterpillar*, 393 F.Supp.2d at 673. The Peoples Republic of China ratified the CISG in 1986 and Hong Kong is a Contracting State under the CISG. *See CNA International v. Guangdon Kelon Electronical Holdings, et al.*, No. 05 C 5734 (N.D.Ill. filed Sept. 3, 2008). Neither Electrocraft nor Super Electric have opted out of the CISG with respect to the contract at issue in this action and both parties have their places of business in different Contracting States under the Convention. Accordingly, the Court finds that the CISG is the applicable law in this action.

2.

Having determined that the CISG is the applicable law in this action, the Court turns to Super Electric's arguments concerning application of the CISG to the claims in Electrocraft's complaint.

i.

Super Electric first argues that count one of Electrocraft's complaint, asserting violations of the CISG, does not set forth sufficient facts to state a claim upon which relief can be granted under the CISG. Super Electric argues that Electrocraft's CISG claim makes general and conclusory statements of liability under the CISG but does not set forth applicable CISG provisions so as to provide a legal framework for evaluating the allegations of the complaint, such as setting forth details about the notice of nonconformity or articulating whether Electrocraft inspected the goods within a reasonable amount of time. Electrocraft, however, explained its course of dealing with Super Electric and noted that the parties had a contract for the sale of goods, that Electrocraft inspected the goods, and that Electrocraft notified Super Electric of the nonconformity of the goods as soon as it learned of the nonconformity from customers (and that Super Electric confirmed the goods' nonconformity). The Court finds that Electrocraft has set forth at this juncture sufficient details underlying its CISG claim. While it may be that Electrocraft's CISG claim will not survive summary judgment or trial, *see, e.g., Chicago Prime Packers, Inc. v. Northam Food Trading Co.*, 320 F.Supp.2d 702 (N.D.Ill. 2004) (addressing certain matters that must be proved at trial for breach of contract under CISG), Electrocraft has pled in count one of the complaint "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

ii.

Super Electric argues that even if a claim under the CISG has been stated, the CISG preempts Electrocraft's state law causes of action. Certainly, as a treaty to which the United

States is a signatory, the CISG is federal law; thus, under the Supremacy Clause, it preempts inconsistent provisions of state law where it applies. *Caterpillar*, 393 F.Supp.2d at 673 (citation omitted). The issue is one of scope. *Id*. State law causes of action that fall within the scope of federal law are preempted. *Id*. Conversely, state law causes of action that fall outside the scope of federal law will not be preempted. *Id*. Thus, the CISG preempts Electrocraft's state law claims only if such claims fall within the scope of the CISG. *Cf. Asante Technologies, Inc. v. PMC-Sierra, Inc.*, 164 F.Supp.2d 1142, 1151-52 (N.D.Cal. 2001) (the CISG preempted state law contract claim); *Miami Valley Paper, LLC v. Lebbing Engineering & Consulting GmbH*, No. 1:05-CV-00702, 2006 WL 2924779, at *3 (S.D.Ohio Oct. 10, 2006) (the CISG did not prevent plaintiff from pleading negligent misrepresentation and fraudulent inducement).

a.

Concerning Electrocraft's breach of express and implied warranties under Article 2 of the Arkansas UCC as set forth in counts two and three of the complaint, Electrocraft "concedes that its breach of contract and warranty claims are rooted in the CISG" and essentially agrees that its breach of warranty claims under Article 2 of the Arkansas UCC are preempted by the CISG. *See, e.g., Sky Cast, Inc. v. Global Direct Distribution, LLC*, Civil Action No. 07-161-JBT, 2008 WL 754734, at *4 (E.D. Ky. March 18, 2008) (finding that the CISG governed contract and preempted the applicability of Article 2 of the UCC to the transactions for the sale of goods that ordinarily would be controlled by Article 2 of the UCC). Electrocraft states it asserted claims under the UCC only in the event this Court determined that Hong Kong was not a signatory of the CISG and that the CISG thus was not the applicable law. As previously noted, however, the

Court today finds that Hong Kong is a Contracting State under the CISG and that the CISG is the applicable law to this action. Accordingly, Electrocraft's warranty claims under Article 2 of the Arkansas UCC – counts two and three of the complaint – are preempted and subsumed by the CISG. Electrocraft may, however, assert, consistent with its complaint, all rights and remedies under the CISG (as may Super Electric), including warranty provisions under CISG Article 35. *See, e.g., Miami Valley Paper, LLC v. Lebbing Engineering & Consulting Gmbh*, No. 1:05-CV-00702, 2009 WL 818618, at *10-11 (S.D. Ohio, March 26, 2009) (breach of warranty for a particular purpose governed by CISG Article 35(3)); *Norfolk Southern Ry. Co. v. Power Source Supply, Inc.*, Civil Action No. 06-58 J, 2008 WL 2884102, at *5 (W.D.Pa. July 25, 2008) (although the CISG does not specifically include the implied warranties of fitness and merchantability, CISG Article 35 may properly be read to suggest them).[2]

b.

Whether Electrocraft's negligence/strict liability claim in count four of the complaint falls within the scope of the CISG and is preempted presents a more difficult question given the relationship of tort and contract and their respective remedies. The CISG is exclusively concerned with the contractual relationship between the seller and the buyer. Ingeborg Schwenzer, Pascal Hachem, *The CISG – Successes and Pitfalls*, 57 Am. J. Comp. L. 457, 470 (2009). However, under most legal systems the mere existence of contractual remedies does not

---

[2] Super Electric argues that because Electrocraft's state law breach of warranty claims are preempted, Electrocraft should be given the opportunity to re-plead its breach of warranty claims under the CISG. The Court, however, interprets Electrocraft's complaint as sufficiently alleging breach of warranty claims under the CISG and notes as well that Super Electric acknowledges that CISG Article 35 is applicable in this action and establishes essential legal elements of Electrocraft's claims. Def.s' Joint Mot. to Dismiss Pl.'s Complaint at 7.

preclude a party from relying on other remedies, particularly those based on tort. *Id*. In this respect, "[l]iability based on breach of an international sales contract falling under CISG may 'collide' or 'concur' with liability based on domestic tort law rules." Schlechtriem, *The Borderland of Tort and Contract: Opening a New Frontier?*, 21 Cornell Int'l L. J. at 467.

Commentators differ on the preemptive effect of the CISG on tort remedies. For example, one pair of commentators argue that "[i]f one seeks to achieve the greatest level of uniformity, it cannot be left to individual states to apply their domestic laws, whether contractual or based on tort" and that the need to promote uniformity as it is laid down in CISG Article 7(1) thus requires that "the CISG displaces any domestic rules if the facts that invoke such rules are the same that invoke the Convention." Schwenzer, Hachem, *The CISG – Successes and Pitfalls*, 57 Am. J. Comp. L. at 471. "In other words, wherever concurring domestic remedies are only concerned with the non-conformity of the goods – such as negligence in delivering non-conforming goods, negligent misrepresentation of their qualities, or mistake as to their substance – such remedies must be pre-empted by the CISG." *Id*.[3]

Another commentator argues that contractual and delictual remedies have coexisted in many jurisdictions for centuries, and a given State's ratification of the sales Convention does not imply its intention to merge contract with tort. Joseph Lookofsky, *In Dubio Pro Conventione? Some Thoughts About Opt-Outs, Computer Programs, and Preemption Under the 1980 Vienna*

---

[3] Although the aim of the CISG is to promote worldwide uniformity in dealing with sales disputes arising from international sales, obstacles to a uniform interpretation of the CISG have been noted, including the absence of a supranational body empowered to review and resolve conflicting decisions, Susan J. Martin-Davidson, *Selling Goods Internationally: Scope of the U.N. Convention on Contracts for the Sale of International Goods*, 17 Mich. St. J. Int'l L. 657, 660-61 (2008-2009), and a tendency by some to interpret the CISG in conformity with the background assumptions and conceptions that the interpreter, trained in a particular domestic legal tradition, brings to the task, a tendency that has been labeled the "homeward trend." Harry Flechtner, *Article 79 of the United Nations Convention on Contracts for the International Sale of Goods (CISG) as Rorschach Test: The Homeward Trend and Exemption for Delivering Non-Conforming Goods*, 19 Pace Int'l L. Rev. 29, 30-31 (2007).

*Sales Convention (CISG)*, 13 Duke J. Comp. & Int'l L. 263, 286 (2003). It is argued that "[t]he possibility that some domestic rules might be allowed to compete with (also applicable) CISG rules represents little threat to the global goal of achieving a uniform Convention interpretation, and the application of domestic rules should not be preempted simply because the operative facts of a given case seem 'covered' by a given CISG rule." *Id.* at 288.

Despite differing viewpoints concerning the preemptive effect of the CISG on tort remedies, there is agreement that concurring state contractual claims are preempted by the CISG. Ingeborg Schwenzer, *Buyers Remedies in the Case of Non-Conforming Goods: Some Problems in a Core Area of the CISG*, 101 Am. Soc'y Int'l L. Proc. 416, 421 (2007). *See also Forestal Guarani, S.A. v. Daros International, Inc.*, Civil Action No. 03-4821 (JAG), 2008 WL 4560701, at *2 n.4 (D.N.J. Oct. 08, 2008) (the CISG, a treaty of the United States, preempts state contract law and common law, to the extent those causes of action fall within the scope of the CISG). Thus, a tort that is in essence a contract claim and does not involve interests existing independently of contractual obligations (such as goods that cause bodily injury) will fall within the scope of the CISG regardless of the label given to the claim, *see* Schlechtriem, *The Borderland of Tort and Contract: Opening a New Frontier?*, 21 Cornell Int'l L. J. at 473, and therefore not require a determination concerning the preemptive effect of the CISG on tort remedies. *See also Geneva Pharmaceuticals Tech. Corp. v. Barr Labs, Inc.*, 201 F.Supp.2d 236, 286 n.30 (S.D.N.Y. 2002) ("Just because a party labels a cause of action a 'tort' does not mean that it is automatically not pre-empted by the CISG. A tort that is actually a contract claim, or that bridges the gap between contract and tort law may very well be pre-empted") (citing Schlechtriem, *The Borderland of Tort and Contract: Opening a New Frontier?*, 21 Cornell Int'l

L. J. at 474), *aff'd in part, rev'd in part on other grounds*, 386 F.3d 485 (2nd Cir. 2004). The question for this Court, then, is whether Electrocraft's negligence/strict liability claim is, as argued by Super Electric, "actually ... a breach-of-contract claim in masquerade."

The difference between an action in contract and one in tort is not always exact. *Bankston v. Pulaski County School Dist.*, 281 Ark. 476, 479, 665 S.W.2d 859, 862 (1984). "[W]hether an action is based on contract or tort depends on the right sued upon, not the form of the pleading or relief demanded." *Curry v. Thornsberry*, 81 Ark. App. 112, 121, 98 S.W.3d 477, 483 (2003). "If based on breach of promise it is contractual; if based on breach of a non-contractual duty it is tortious." *Id*. Damages prayed for are a factor to consider in determining whether an action is in contract or tort. *Bankston*, 281 Ark. at 479, 665 S.W.2d at 862. The purpose of the law of contract is to see that promises are performed, whereas the law of torts provides redress for various injuries. *Id*. Owing to that distinction, the measure of damages in contract cases differs from that in tort cases. *Id*. In tort cases, the purposes of the law is to compensate the plaintiff for the injury inflicted even though it may have been unexpected, but in contract cases the special damages must have been in contemplation of the parties when the agreement was made. *Id.*

The Court has considered the matter and determines that Electrocraft's negligence/strict liability claim is based on contract. As previously noted, Electrocraft "concedes that its breach of contract and warranty claims are rooted in the CISG," and "it further concedes that its negligence [and, necessarily, strict liability[4]] claim is based on the same factual allegations: that [Super Electric] had a duty to provide conforming goods to Electrocraft, it failed to do so and

---

[4] Electrocraft states that Super Electric's "conduct in manufacturing and furnishing the defective motors ... was negligent conduct for which [Super Electric] should be held strictly liable." Compl. at ¶ 45.

11

such failure caused Electrocraft to sustain damages." Pl.'s Br. in Supp. of its Resp. to Def.'s Mot. to Dismiss at 8-9 [doc.#17].  But these are not allegations of wrongdoing that are extra-contractual or otherwise amount to a breach of a duty distinct from or in addition to the breach of contract claim at issue in this action.  Rather, the obligation of the seller to deliver goods conforming to the contract and the interests of the buyer to use, consume, or to resell the goods purchased, and therefore to receive them conforming to the contract, as alleged by Electrocraft, are economic interests that are basically contractual and regulated by the CISG and its rules and remedies for international sales.  Schlechtriem, *The Borderland of Tort and Contract: Opening a New Frontier?*, 21 Cornell Int'l L. J. at 473.  In addition, Electrocraft seeks identical damages for its negligence/strict liability claim as it seeks for its breach of contract and warranty claims.  It is clear, then, that Electrocraft's negligence/strict liability claim is based on breach of contract, not breach of a non-contractual duty, and Electrocraft's negligence/strict liability claim in count four of the complaint is thus preempted by and subsumed within the CISG.  Electrocraft may, however, assert, consistent with its complaint, all rights and remedies under the CISG, as may Super Electric.

c.

Concerning Electrocraft's unjust enrichment and restitution claims in count seven of the complaint, Electrocraft essentially agrees that to the extent Super Electric would concede or this Court would determine the existence of a valid contract, the unjust enrichment claim is preempted by the CISG.  Super Electric does not dispute the existence of a valid contract, however, and so Electrocraft's unjust enrichment claim is preempted and subsumed by the CISG.

In addition, Electrocraft states that its restitution claim is a remedy under the CISG. Accordingly, the Court finds that Electrocraft's unjust enrichment and restitution claims in count seven of the complaint are preempted and subsumed by the CISG. Electrocraft may, however, assert, consistent with its complaint, all rights and remedies under the CISG, as may Super Electric.

3.

The Court now turns to Super Electric's argument that Electrocraft's ADTPA claim in count five of the complaint is preempted by the CISG and must in any case be dismissed as that Act applies only to actions brought by consumers. The Court rejects both of these arguments.

First, the Court finds that the matters for which the ADTPA provides redress do not fall within the scope of the CISG as the CISG does not preempt claims for "misrepresentation, fraud, betrayal and intentional harm to economic interests." Schlechtriem, *The Borderland of Tort and Contract: Opening a New Frontier?*, 21 Cornell Int'l L.J. at 474. Accordingly, the CISG does not preempt Electrocraft's ADTPA claim.

The Court additionally finds that the ADTPA is not limited to actions brought by consumers. In support of its argument that the ADTPA is so limited, Super Electric cites *Mosby v. International Paper Co., Inc.*, No. 5:07cv00314-WRW, 2008 WL 2669148, at *2 (E.D.Ark. July 1, 2008). The Court does not find *Mosby* to be persuasive authority for the issue cited, however.

*Mosby* involved a situation in which the plaintiff alleged breach of contract and deceptive trade practices by International Paper Company, with which plaintiff had entered into a contract

to be a contract logger. In determining that the plaintiff failed to state a cause of action under the ADTPA upon which relief can be granted, the court in *Mosby* quoted the Preamble to the ADTPA and concluded that "[a]pplying the ADTPA in a situation where the provider of services, rather than the consumer, was allegedly injured seems out of line with both the ADTPA's purpose, and case law under the ADTPA," and that "[b]ecause the ADTPA was enacted to protect consumers, the facts alleged under Plaintiff's ADTPA cause of action do not appear to be of the type that give rise to a cause of action under that Act." 2008 WL 2669148, at *2. But even though it may initially seem or appear that the ADTPA does not apply to non-consumers, the plain and unambiguous language of the ADTPA is controlling, *K.C. Properties of N.W. Arkansas, Inc. v. Lowell Inv. Partners, LLC*, 373 Ark. 14, 19-20, 280 S.W.3d 1, 7 (2008), and in that regard, the ADTPA makes clear that (1) the Act is meant to protect both the consumer public and the legitimate business community, *see* Ark. Code Ann. § 4-88-105(c) (Act creates Consumer Protection Division to protect legitimate business community and the general public as consumers), and (2) Ark. Code Ann. § 4-88-113(f) allows a cause of action for any person who suffers damages as a result of an unconscionable, false or deceptive act or practice in business, commerce, or trade, with "person" being defined in Ark. Code Ann. § 4-88-102(5) as an "individual, organization, group, association, partnership, corporation, or any combination of them." *See Heartland Community Bank v. Citigroup Global Markets, Inc.*, No. 4:07CV01113 JMM, 2008 WL 5186530, at *3 (E.D.Ark. Dec. 09, 2008) (rejecting argument that the Act is not applicable to a non-consumer plaintiff, citing Ark. Code Ann. § 4-88-105(c), Ark. Code Ann. §

4-88-113(f), and Ark. Code Ann. § 4-88-102(5)).[5] The ADTPA "does not state that business entities or non-consumers cannot utilize its provisions as a basis for recovery" and, "[t]hus, one does not have to be a consumer to recover under the ADTPA." *Valor Healthcare, Inc. v. Pinkerton*, No. 08-6015, 2008 WL 5396622, at *3 (W.D.Ark. Dec. 23, 2008). Accordingly, the Court denies Super Electric's motion to dismiss Electrocraft's ADTPA claim in count five of the complaint.[6]

4.

Finally, Super Electric argues that Electrocraft's tortious interference with business expectancy claim in count six of the complaint is preempted by the CISG and that Electrocraft in any case cannot plead facts to meet the elements of such a cause of action. The Court disagrees.

First, being a tort claim alleging intentional harm to economic interests, the Court concludes that Electrocraft's tortious interference with business expectancy claim is not preempted by the CISG, which only concerns the sales of goods between merchants in different countries. *Viva Vino Import Corp. v. Farnese Vini S.r.I*, No. CIV.A. 99-6384, 2000 WL 1224903, at *1 (E.D.Pa. Aug. 29, 2000) (CISG inapplicable to plaintiff's claim of tortious

---

[5] In addition, as noted in *Heartland Community Bank*, the Arkansas Supreme Court in *Baptist Health v. Murphy*, 365 Ark. 115, 226 S.W.3d 800 (2006), allowed the application of the ADTPA in a nontraditional consumer situation. 2008 WL 5186530, at *3. Specifically, the Arkansas Supreme Court held that a circuit court did not clearly err in finding that Baptist Health's economic credentialing policy, which mandated denial of professional staff appointments or clinical privileges at Baptist Health hospitals to practitioners who directly or indirectly acquire or hold ownership or investment interests in a competing hospital, constituted a violation of the ADTPA. *Baptist Health*, 365 Ark. at 129, 800 S.W.3d at 811.

[6] Super Electric also cites *Whistle v. David H. Arrington Oil & Gas, Inc.*, No. 2:08cv0037 BSM, 2009 WL 1529819 (E.D.Ark. Jun. 01, 2009), in support of its argument that the ADTPA applies only to actions brought by consumers. This decision is of no benefit to Super Electric as the court in *Whistle* acknowledged the argument, based on *Mosby*, that the ADTPA does not apply to sellers or providers of goods or services but did not resolve the argument, finding that the ADTPA claim had been abandoned. 2009 WL 1529819, *12. In any case, the Court would reject any finding in *Whistle* that the ADTPA applies only to actions brought by consumers for the same reasons the Court has rejected such a finding in *Mosby*.

interference with business relations).  *See also* Schlechtriem, *The Borderland of Tort and Contract: Opening a New Frontier?*, 21 Cornell Int'l L.J. at 474 (CISG does not preempt claims for intentional harm to economic interests).

The Court additionally finds that Electrocraft has sufficiently pled a tortious interference with business expectancy claim.  The elements of tortious interference that must be proved are: (1) the existence of a valid contractual relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.  *K.C. Properties of N.W. Arkansas*, 373 Ark. at 26, 280 S.W.3d at 11 (citations omitted).  The conduct of the defendant must be at least "improper."  *Id*.  In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors: (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the other with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; and (f) the proximity or remoteness of the actor's conduct to the interference and the relations between the parties.  *Id*. 373 Ark. at 26-27, 280 S.W.3d at 11-12.  Intentional torts involve consequences which the actor believes are substantially certain to follow his actions.  *Baptist Health*, 365 Ark. at 124, 226 S.W.3d at 808.  The defendant must have either desired to bring about the harm to the plaintiff or have known that this result was substantially certain to be produced by his conduct.  *Id*.

Super Electric argues that Electrocraft cannot plead facts supporting the third element of a tortious interference claim, *i.e.*, that Super Electric engaged in any intentional, improper interference with Electrocraft's relationships or expectancies. Electrocraft alleges, however, that Super Electric knowingly supplied defective motors despite the knowledge that Electrocraft was dependent upon Super Electric to supply conforming motors, and that as a direct and proximate result of Super Electric's tortious interference, and because Super Electric's conduct in this matter was willful and malicious, it caused the termination of Electrocraft's business expectancy with Whirlpool and another manufacturer. The Court finds that Electrocraft has sufficiently pled at this juncture a tortious interference claim. While it may be that Electrocraft's tortious interference claim will not survive summary judgment or trial, Electrocraft has pled in count six of the complaint "enough facts to state a claim to relief that is plausible on its face." *Twombly, 550 U.S. at 570*.

### III.

For the foregoing reasons, the Court grants in part and denies in part Super Electric's motion to dismiss [doc.#4].[7]

IT IS SO ORDERED this 23rd day of December 2009.

/s/Susan Webber Wright  
UNITED STATES DISTRICT JUDGE

---

[7] Raymond O'Gara's separate motion to dismiss [doc.#6] is denied as moot.