IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

ELECTROCRAFT ARKANSAS, INC.,      *
                                  *
                Plaintiff,        *
                                  *
vs.                               *      No. 4:09cv00318 SWW
                                  *
                                  *
                                  *
SUPER ELECTRIC MOTORS, LTD and    *
RAYMOND O'GARA, INDIVIDUALLY      *
AND AS PARTNER AND AGENT OF       *
SUPER ELECTRIC MOTORS, LTD,[1]    *
                                  *
                Defendants.       *

MEMORANDUM AND ORDER

Electrocraft Arkansas, Inc. (Electrocraft) brings this action against Super Electric

Motors, Ltd (Super Electric) asserting the following claims in connection with allegedly

defective refrigerator motors that Electrocraft purchased from Super Electric: violations

of the United Nations Convention on Contracts for the International Sale of Goods

(CISG); violations of Article 2 of the Uniform Commercial Code (UCC), codified in Ark.

Code Ann. §§ 4-2-101 et seq.; breach of express warranty; breach of implied warranty of

merchantability; negligence/strict liability; violations of the Arkansas Deceptive Trade

Practices Act (ADTPA), codified in Ark. Code Ann. §§ 4-88-101 et seq.; tortious

interference with a business expectancy; and unjust enrichment and restitution.  Super

Electric has counterclaimed against Electrocraft under the CISG and seeks judgment

---

[1] Separate defendant Raymond O'Gara has been voluntarily dismissed from this action.

against Electrocraft for unpaid invoices in the amount of $1,126,077.92 and lost profits in excess of $1,000,000.

By Memorandum and Order entered December 23, 2009 [doc.#23], the Court granted in part and denied in part a motion of Super Electric to dismiss Electrocraft's complaint.  The Court determined that (1) the CISG is the applicable law in this action; (2) Electrocraft's complaint, asserting violations of the CISG, sets forth sufficient facts to state a claim upon which relief can be granted under the CISG; (3) the CISG preempts and subsumes the breach of express and implied warranty claims under Article 2 of the Arkansas UCC contained in counts two and three of Electrocraft's complaint; (4) the CISG preempts and subsumes the negligence/strict liability claim in count four of Electrocraft's complaint; (5) the ADTPA claim in count five of Electrocraft's complaint is not preempted by the CISG and the ADTPA is not limited to actions brought by consumers; (6) the tortious interference with business expectancy claim in count six of Electrocraft's complaint is not preempted by the CISG and Electrocraft has pled facts to meet the elements of such a cause of action; and (7) the unjust enrichment and restitution claims in count seven of Electrocraft's complaint are preempted and subsumed by the CISG.  *See Electrocraft Arkansas, Inc. v. Super Electric Motors, Ltd*, No. 4:09cv00318 SWW, 2009 WL 5181854 (E.D.Ark. Dec. 23, 2009).

Now before the Court are the following motions: (1) motion of Super Electric for summary judgment on its counterclaim under the CISG [doc.#30]; (2) motion of Electrocraft for summary judgment on its CISG claims [doc.#43]; and (3) motion of

Super Electric for leave to take the deposition of Stephen Draper of Whirlpool Corporation and/or Whirlpool's custodian of records concerning John Arico's letter of January 14, 2009 and related communications, and to subpoena related documents [doc.#64]. Electrocraft has responded in opposition to Super Electric's motion for summary judgment on its counterclaim, Super Electric has filed a reply to Electrocraft's response, and Electrocraft, with leave of the Court, has filed a sur-reply to Super Electric's reply.[2] Super Electric, in turn, has responded in opposition to Electrocraft's motion for summary judgment on its CISG claims and Electrocraft has filed a reply to Super Electric's response. Electrocraft has also responded in opposition to Super Electric's motion for additional discovery. Having carefully considered the matter, the Court denies Super Electric's motion for summary judgment on its counterclaim under the CISG, denies Electrocraft's motion for summary judgment on its CISG claims, and denies Super Electric's motion for additional discovery.

## I.

Electrocraft is a Delaware corporation doing business in the State of Arkansas and supplies electric refrigerator motors to manufacturers of refrigerators. Super Electric is a company engaged in the manufacture of refrigerator motors. Super Electric was formed under the laws of Hong Kong and its manufacturing facilities are located in Shenzhen, China.

---

[2] The Court denied a motion of Electrocraft to strike Super Electric's reply for allegedly containing new arguments not raised in its motion for summary judgment but allowed Electrocraft to file a sur-reply to Super Electric's reply.

Beginning in approximately 2002, Super Electric manufactured electric motors pursuant to purchase orders received from Electrocraft based upon the designs and specifications submitted to Super Electric by Electrocraft.  According to Electrocraft, the motors were able to be utilized for their intended purpose (incorporated into refrigerators to make the refrigerators cool) after being inspected by Electrocraft and would then be delivered to Electrocraft's customers, including Whirlpool and other manufacturers, where they were incorporated into refrigerators.  After the manufacture of the electric motors pursuant to Electrocraft's purchase orders, Super Electric submitted invoices that specified the number of motors shipped, the type of motor shipped, and Electrocraft's purchase order number.

The parties originally conducted business pursuant to a written agreement entered into in 2000 but in 2002 the written agreement expired by its own terms.  Electrocraft states that after the agreement expired, the parties continued to operate as though the agreement was still in place, stating that in 2006, Super Electric expressly agreed to continuation of the parties' purchase and sale of Electrocraft's requirements for the electric motors.  Super Electric denies this, stating that after the agreement terminated, the parties' "course of dealing" was for Electrocraft to issue purchase orders for motors and for Super Electric to manufacture those motors pursuant to Electrocraft's design and specifications, and issuing an invoice for each group of motors delivered to Electrocraft.  Super Electric states that Electrocraft accepted delivery of the motors FOB Hong Kong and took them to its facility in Arkansas where it inspected them to ensure that they met

Electrocraft's specifications and then issued rejections and debits as to those motors and paid the balance of the invoices in accordance with the terms of the invoices.

Electrocraft states that in July 2008, it began to receive notices from its customers that the motors supplied by Super Electric were failing at an unacceptable rate. Electrocraft states that it confirmed there were incurable problems with the motors as a result of manufacturing defects and that due to their failure to operate in the intended fashion, the defective motors have been returned to Electrocraft by the end user, causing Electrocraft to be unable to fulfill its contractual obligations to its customers.  Electrocraft states it is currently in possession of approximately 300,000 defective motors manufactured and delivered by Super Electric without having any productive use.

Electrocraft states that Super Electric confirmed that the motors were defective but still demanded payment for the motors that had been delivered.  Electrocraft states that despite demand, Super Electric has been unwilling or unable to cure the situation, to refund for paid invoices, or to void the unpaid invoices for the defective motors, and that Super Electric has caused it damage by way of the loss of existing customers, being forced to pay significant amounts to resolve customer claims and remedy customer complaints, and damage to its business reputation.

Super Electric, in turn, claims that for the period beginning with invoices dated July 15, 2008 and all invoices generated thereafter, there remains due and owing to Super Electric from Electrocraft amounts for goods in the possession of Electrocraft pursuant to its purchase orders and for which Electrocraft has refused to remit payment.  Super

5

Electric states that the motors manufactured and sold to Electrocraft identified by the invoices were all manufactured after Super Electric received purchase orders and that it was assured by Electrocraft that it would pay for the motors, but that Super Electric never received rejections of the specific motors identified by these invoices, much less timely rejections.

Super Electric states that in addition to the electric motors delivered to Electrocraft pursuant to the purchase orders, Super Electric manufactured other electric motors for Electrocraft pursuant to purchase orders, and Electrocraft either refused to take delivery of the motors or has wrongfully attempted to cancel its acceptance of delivery. As to those motors for which Electrocraft has either refused to take delivery or has attempted to cancel its acceptance of delivery, Super Electric states that there remains an amount due and owing to Super Electric for goods manufactured by Super Electric pursuant to Electrocraft's purchase orders but for which Electrocraft has wrongfully failed to take delivery or has wrongfully attempted to cancel its acceptance of delivery.

Super Electric claims that valid contracts for the sale of motors within the meaning of Articles 14-24 of the CISG exist between Super Electric and Electrocraft, that it has manufactured motors pursuant to Electrocraft's purchase orders which have not been paid, and that pursuant to the parties' course of dealing and course of performance of their agreements, both oral and written, and in accordance with the provisions of Electrocraft's purchase orders and the CISG, Electrocraft has fundamentally breached the contracts between Super Electric and Electrocraft within the meaning of Article 25 of the CISG.

Super Electric states it has delivered goods to Electrocraft in accordance with the parties' course of dealing and course of performance of their agreements, and in accordance with the provisions of Electrocraft's design specifications and purchase orders, and that it has delivered goods to Electrocraft in accordance with Article 35 of the CISG.  Super Electric states that following the delivery of the motors, Electrocraft inspected the motors but did not reject them in a timely manner and, in fact, approved them as meeting Electrocraft's specifications and available for re-sale.

Super Electric states that pursuant to Article 39 of the CISG, Electrocraft has waived any right to declare a lack of conformity, or to reject, the motors in its actual or constructive possession, including all motors resold to Whirlpool or other manufacturers by Electrocraft, and that Electrocraft may not reject goods that have already been sold to third parties.  With respect to motors manufactured by Super Electric pursuant to Electrocraft's purchase orders, Super Electric states that Electrocraft has waived the right to declare the purchase orders and the parties' contracts avoided pursuant to Article 49 of the CISG for failure to provide notice to Super Electric within a reasonable time.

Super Electric additionally states that Electrocraft proposed that Super Electric provide brackets to Electrocraft to rework motors returned to Electrocraft by Whirlpool in Monterrey, Mexico, and that as an accommodation to Electrocraft, Super Electric provided replacement brackets to Electrocraft for its use in returning the motors to Whirlpool with the understanding that Electrocraft would remit the amounts owed for the motors to Super Electric.  Electrocraft failed to honor its agreement, states Super Electric,

7

and is liable to Super Electric in the amount of $105,200.76 for the cost of the brackets it provided to Electrocraft.

## II.

Before turning to the parties' motions for summary judgment, the Court first revisits the applicability of the CISG to this action.  In previously concluding that the CISG is the applicable law, the Court determined, based on the reasoning of the Northern District of Illinois in *CNA International v. Guangdon Kelon Electronical Holdings, et al*., No. 05 C 5734 (N.D.Ill. filed Sept. 3, 2008), that the Peoples Republic of China ratified the CISG in 1986 and that Hong Kong is a Contracting State under the CISG.  The Court ruled as follows:

> The CISG is an international treaty, ratified by the United States in 1986, that sets out substantive provisions of law to govern the formation of international sales contracts and the rights and obligations of the buyer and seller.  *Caterpillar, Inc. v. Usinor Industeel*, 393 F.Supp.2d 659, 673 (N.D.Ill. 2005) (citation omitted).  The aim of the CISG is to promote worldwide uniformity in dealing with sales disputes arising from international sales.  Peter Schlechtriem, *The Borderland of Tort and Contract: Opening a New Frontier?*, 21 Cornell Int'l L. J. 467, 472 (1988).  The CISG applies to international sales contracts between parties that are located in signatory countries, and who have not opted out of CISG coverage at the time of contracting.  *Caterpillar*, 393 F.Supp.2d at 673.  The Peoples Republic of China ratified the CISG in 1986 and Hong Kong is a Contracting State under the CISG.  *See CNA International v. Guangdon Kelon Electronical Holdings, et al*., No. 05 C 5734 (N.D.Ill. filed Sept. 3, 2008).  Neither Electrocraft nor Super Electric have opted out of the CISG with respect to the contract at issue in this action and both parties have their places of business in different Contracting States under the Convention.  Accordingly, the Court finds that the CISG is the applicable law in this action.

*Electrocraft*, 2009 WL 5181854, at *3.

After this Court drafted its Memorandum and Order in *Electrocraft* (but prior to its entry), the Northern District of Georgia, utilizing reasoning in direct contrast to that of the Northern District of Illinois in *CNA International*, determined that Hong Kong is not a Contracting State under the CISG and therefore the CISG did not apply to the plaintiff's breach of contract action.  *See Innotex Precision Limited v. Horei Image Products, Inc., 679 F.Supp.2d 1356, 1358-59 (N.D.Ga. 2009).*[3]  Given these conflicting authorities, the Court directed that the parties address the impact, if any, of *Innotex Precision* on these proceedings.  The parties have responded with a joint statement regarding choice of law in which both parties submit that notwithstanding *Innotex Precision*, Hong Kong is a Contracting State under the CISG and the CISG therefore applies to this action.  Having reviewed the parties' joint statement, the Court reaffirms that the CISG is the applicable law.

Neither Electrocraft nor Super Electric contests the application of the CISG to this action and the court in *CNA International* engaged in both a detailed consideration of whether Hong Kong is a Contracting State and a comprehensive review of applicable authority.  In addition, the court's opinion in *CNA International* is bolstered by strong policy considerations regarding the CISG's aim to promote worldwide uniformity in dealing with sales disputes arising from international sales.  Regardless of whether the court in *Innotex Precision* would have agreed with *CNA International* had it been aware

---

[3] In so ruling, the court erroneously noted that "no American court has addressed whether Hong Kong is a Contracting State" under the CISG.  *Id.* at 1359.

of that decision, the Court agrees with and adopts the reasoning and conclusions of *CNA International*, finding nothing in *Innotex Precision* that compels this Court to reconsider its earlier decision that Hong Kong is a Contracting State.[4]

III.

Having reaffirmed that the CISG is the applicable law in this action, the Court now turns to the parties' motions for summary judgment.  Super Electric moves for summary judgment under the CISG on its counterclaim on grounds that Electrocraft breached the parties' contract by failing to pay for the electric motors manufactured pursuant to the purchase orders, Electrocraft did not make a proper and timely rejection of any of the motors covered by the invoices that are the subject of the counterclaim, and Electrocraft did not make an inspection of the motors within a reasonable time.  Electrocraft, in turn, moves for summary judgment on its CISG claims on grounds the motors were nonconforming upon reaching the end user (Electrocraft's customers) and Super Electric is not insulated from liability because Electrocraft inspected the motors.   Both parties argue there are no genuine issues of material fact with respect to these issues and that each is entitled to summary judgment on its CISG claims as a matter of law.

A.

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to

---

[4] As the court's opinion in *CNA International* is unpublished, and so the reader will have the benefit of that court's reasoning (as adopted by this Court) as to why Hong Kong is a Contracting State under the CISG, the Court sets forth the substance of *CNA International* in an appendix to this Memorandum and Order.

any material fact and that the movant is entitled to a judgment as a matter of law."
Fed.R.Civ.P. 56(c).  As a prerequisite to summary judgment, a moving party must
demonstrate "an absence of evidence to support the non-moving party's case." *Celotex
Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party has properly
supported its motion for summary judgment, the nonmoving party must "do more than
simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec.
Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  The nonmoving party may not rest
on mere allegations or denials of his pleading, but "must come forward with 'specific
facts showing ... a *genuine issue for trial*.'"  *Id*. at 587 (quoting Fed.R.Civ.P. 56(e) and
adding emphasis).  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).
The inferences to be drawn from the underlying facts must be viewed in the light most
favorable to the party opposing the motion.  *Matsushita,* 475 U.S. at 587 (citations
omitted).  However, "[w]here the record taken as a whole could not lead a rational trier of
fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Id*. (citation
omitted).  "Only disputes over facts that might affect the outcome of the suit under the
governing law will properly preclude the entry of summary judgment." *Anderson*, 477
U.S. at 248.  "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## B.

The primary points of contention between the parties are whether Electrocraft
properly inspected the motors, whether the motors at issue were nonconforming upon
reaching the end user (and the reason for any non-conformity), whether Electrocraft

11

timely rejected the motors, and the nature of the course of conduct between the parties.  In addressing these issues, the parties differ significantly on both the facts and the application of the CISG to those facts.

Super Electric argues there are no genuine issues of material fact that Electrocraft failed to timely inspect the particular motors and failed to timely and properly provide the required notice of rejection as to those motors.  Super Electric notes that the following provisions of the CISG required Electrocraft to inspect and reject motors that did not meet its specifications and purchase orders:

> *Article 38*
>   (1) The buyer must examine the goods, or cause them to be examined, within as short a period as is practicable in the circumstances.
>
>   ...
>
> *Article 39*
>   (1) The buyer loses the right to rely on a lack of conformity of the goods if he does not give notice to the seller specifying the nature of the lack of conformity within a reasonable time after he has discovered it or ought to have discovered it.
>   (2) In any event, the buyer loses the right to rely on a lack of conformity of the goods if he does not give the seller notice thereof at the latest within a period of two years from the date on which the goods were actually handed over to the buyer, unless this time-limit is inconsistent with a contractual period of guarantee.
>
>   ...
>
> *Article 49*
>   ...
>   (2) ... [I]n cases where the seller has delivered the goods, the buyer loses the right to declare the contract avoided unless he does so:
>   ...
>   (b) in respect of any breach other than late delivery, within a reasonable

time:
> (i) after he knew or ought to have known of the breach; ....

While seemingly acknowledging that there were problems with at least some of the motors, Super Electric, in arguing a lack of proper notice pursuant to Articles 38 and 39, argues that Electrocraft never identified which *specific* motors it contends are defective or nonconforming to the end user and that without knowing which specific motors are at issue, the Court cannot possibly determine whether they are nonconforming.  Super Electric further notes that it suggested as early as January 2007 that the design of the motors needed to be changed to increase the clearance between the shaft and bearing but that Electrocraft refused to allow that change in the design.  Super Electric goes on to state that "perhaps more importantly from a design standpoint," it is undisputed that the motors were not designed to meet at least one of the Whirlpool tests.

Electrocraft, however, argues that the nonconformity of the motors was not the fault of the design as the same design had provided working motors for years prior to 2008; rather, the nonconformity was due to issues with the quality control in Super Electric's manufacturing process, *i.e.* faulty manufacturing and assembly.  Electrocraft notes that while Super Electric suggested a change in the design of the motors (in order to make to easier for it to produce the motors alleges Electrocraft), the changes were not necessary and did not result in a motor that worked.  Electrocraft further argues the nonconformity was a latent defect not capable of easy detection.[5]

---

[5] Electrocraft argues it could not ferret out the latent defects short of a total disassembly of the affected motors.

In response to Super Electric's argument that Electrocraft never identified which specific motors it contends are defective or nonconforming, Electrocraft argues that the nonconforming nature of a substantial number within a lot or installment or among several lots is a fundamental breach and that courts have found liability when it is undisputed that at least some of the goods were defective, citing *Delchi Carrier SpA v. Rotorex*, 71 F.3d 1024, 1028 (2nd Cir. 1995) (finding no genuine issue of material fact regarding liability where it was admitted that "some of the compressors ... did not conform to the nominal performance information.").  Electrocraft argues that Articles 38 and 39 do not require specification of the particular goods that are defective; rather, Article 39 only requires notice of the specific nonconformity – not the individual items that are nonconforming.[6]  Electrocraft argues that it notified Super Electric of the nonconformity of the goods as soon as it learned of the nonconformity from customers (and that Super Electric confirmed the goods' nonconformity), and that given that, any dispute concerning the notice presents genuine issues of material fact as to whether Electrocraft's inspection was timely under the CISG (Article 38), and whether the notice specifying the nature of the lack of conformity was given within a reasonable time after the buyer discovered or ought to have discovered the nonconformity (Article 39).  *See*

---

[6] Super Electric argues there is one unpaid Whirlpool invoice (#IV20680/A9) unrelated to any alleged defect and that Super Electric is entitled to summary judgment on that invoice for that reason alone.  Electrocraft concedes that invoice dealt with motors other than those allegedly defective items provided for Whirlpool, but states that invoice concerns a situation that arose after the dispute between the parties had come to a head and that it is exercising an affirmative defense of set-off as it relates to the damages that Electrocraft claims from Super Electric, rendering summary judgment on that invoice inappropriate.

*Chicago Prime Packers, Inc. v. Northam Food Trading Co.*, 320 F.Supp.2d 702, 711-12 (N.D.Ill. 2004) (the determination of what period of time is "practicable" under Article 38(1) is a factual one and depends on the circumstances of the case). Electrocraft argues that it satisfied its legal obligation to inspect goods to insure their apparent conformity under Article 38, and that Super Electric was not relieved of its responsibilities to provide a defect-free product, which it was not doing in 2008.

The parties additionally dispute the nature of their course of conduct. Specifically, Super Electric argues that each purchase order constituted a new and distinct contract, while Electrocraft argues there was a continuing flow of motors from Super Electric to Electrocraft with no substantive distinction between one purchase order and the next that would create separable contracts; rather, each purchase order was just another installment to fill the ongoing need for products.

The Court has considered the record and arguments of Super Electric and Electrocraft and is unable to resolve at this time the issues of whether Electrocraft properly inspected the motors, whether the motors at issue were nonconforming upon reaching the end user (and the reason for any non-conformity), whether Electrocraft timely rejected the motors, and the nature of the course of conduct between the parties. These issues are intertwined with genuine factual disputes and are not appropriate for summary judgment.[7]

---

[7] To the extent these issues present legal questions for the Court to resolve, those questions will be resolved at such time as any issues arise during the trial and/or upon further development of the record.

IV.

The Court now turns to Super Electric's motion for leave to take the deposition of Stephen Draper of Whirlpool Corporation and/or Whirlpool's custodian of records concerning John Arico's letter of January 14, 2009 and related communications, and to subpoena related documents [doc.#64].  Super Electric seeks to dispose Draper about the January 14, 2009 letter and its relationship to an offer from Electrocraft to Whirlpool to settle Electrocraft's dispute with Whirlpool.  Super Electric argues that the settlement between Electrocraft and Whirlpool gives rise to the largest component of the damage claim by Electrocraft in this case, and Super Electric believes the settlement is also contrary to the position taken by Electrocraft in communications with Super Electric.

Super Electric's motion is denied as Rule 408 of the Federal Rules of Evidence expressly provides that evidence of furnishing, offering, promising, or accepting a settlement is not admissible to prove the validity of any claim, and that evidence of conduct or statements made in settlement negotiations is likewise not admissible. *Williams v. Security Nat. Bank of Sioux City, Iowa*, 358 F.Supp.2d 782, 789 (N.D.Iowa 2005) (internal quotation marks omitted); *see also Phan v. Trinity Regional Hosp.*, 3 F.Supp.2d 1014, 1018 (N.D.Iowa 1998) (evidence of settlement offers, demands, or negotiations generally not admissible).[8]  Super Electric has not cited any authority

---

[8] Electrocraft states that as it relates to the Whirlpool element, it is seeking only the amount of the negotiated settlement and that Electrocraft has provided all relevant information about that.  Electrocraft states that Super Electric has seen evidence that Whirlpool's claims exceeded $5 million and it has also seen proof of the fact that Electrocraft entered into an agreement to satisfy those claims for $1.1 million.

suggesting such evidence would be admissible.  The Court notes as well that the

discovery deadline has long since passed and dispositive motions have been filed and

today ruled upon; this matter is now ready for trial.

V.

For the foregoing reasons, the Court denies Super Electric's motion for summary

judgment on its counterclaim [doc.#30], denies Electrocraft's motion for summary

judgment on its claims under the CISG [doc.#43], and denies Super Electric's motion for

leave to take the deposition of Stephen Draper of Whirlpool Corporation and/or

Whirlpool's custodian of records concerning John Arico's letter of January 14, 2009 and

related communications, and to subpoena related documents [doc.#64].


IT IS SO ORDERED this 19th of August 2010.


/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE

## APPENDIX

*CNA International v. Guangdon Kelon Electronical Holdings, et al.*, No. 05 C

5734 (N.D.Ill. filed Sept. 3, 2008), which holds that Hong Kong is a Contracting State

under the CISG, provides, in large part, as follows:

> Because the GISG only applies to parties with places of business in different Contracting States, the Court must determine whether the parties to the contract at issue here are from Contracting States.  *See* ClSG, *supra,* art. 1(a); *see also Treibacher Industrie, A.G.* v. *Allegheny Techs., Inc., 464 F.3d 1235, 1238 n.5 (11th Cir. 2006).*  Plaintiff CNA is an Illinois corporation with its place of business in Illinois. (R. 158-1; Pl.'s Mem. at 12.)  Defendant Guangdong Kelon is a company organized under the laws of China and it maintains its place of business in China.  (*ld.* at 12-13.)  The United States and China are Contracting States, thus the CISG reaches both CNA and Guangdong.

> The Court previously determined that although Defendant Kelon International is organized under the laws of the British Virgin Islands, its place of business for purposes of the CISG is in Hong Kong. (R. 155-1; June 17, 2008 Mem. Op. at 4.)  In its prior Opinion, the Court left open the question of whether Hong Kong is a Contracting State under the CISG; a question the Court must now resolve.  The Court interprets the treaty's provisions by looking to its plain language and to "the general principles" upon which the treaty is based. *Chicago Prime Packers, Inc. v. Northam Food Trading Co., 408 F.3d 894, 898 (7th Cir. 2005)* (citing CISG, *supra,* art. 7(2)).

### I. Hong Kong Special Administrative Region of China

> On June 30, 1997, the United Kingdom transferred sovereignty over Hong Kong to China. *See* [Ulrich] Schroeter, [*The Status of Hong Kong and Macao Under the United Nations Convention on Contracts for the International Sale of Goods,* 16 Pace Int'l L. Rev. 307], at 313.  The countries had previously agreed on the terms of the hand over and its impact on Hong Kong's legal future. *See* Joint Declaration of the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the People's Republic of China on the Question of Hong Kong, Dec. 19, 1984, 23 I.L.M. 1366 (hereinafter "Joint

Declaration").  The Joint Declaration stipulated that China would establish a Hong Kong Special Administrative Region ("SAR") upon resuming sovereignty of Hong Kong.  *Id.* at 1373.

The Joint Declaration outlines Hong Kong's legal system and declares that China will decide whether international agreements to which it is a party will extend to the Hong Kong SAR. Joint Declaration, *supra*, § XI.  The Joint Declaration also states that the I-long Kong SAR will be under the direct authority of China and that "foreign and defence affairs [of the Hong Kong SAR] are the responsibilities of the Central People's Government."  *Id.* at § I.  Article 13 of the Basic Law of Hong Kong echoes the Joint Declaration in stipulating that the Central People's Government is responsible for foreign affairs relating to the Hong Kong SAR.  *See* Zhonghua Renmin Gongheguo Xianggang Tebie Xingzhengqu ji ben fa (The Basic Law of the Hong Kong Special Administrative Region of the People's Republic of Chlna) art. 13 (hereinafter "XIANGGANG JI BEN FA").

## II. Article 93 of the CISG

In order to determine the status of the Hong Kong SAR under the CISG, the Court looks first to the provisions of the CISG itself.  *See Sale* v. *Haitian Ctrs. Council,* 509 U.S. I55, 194 (1993) ("It is axiomatic that a treaty's plain language must control absent 'extraordinarily strong contrary evidence.'").  Article 93 of the CISG addresses the applicability of the treaty to territorial units of a Contracting State:

> (1) If a Contracting State has two or more territorial units in which, according to its constitution, different systems of law are applicable in relation to the matters dealt with in this Convention, it may, at the time of signature, ratification, acceptance, approval or accession, declare that this Convention is to extend to all its territorial units or only to one or more of them, and may amend its declaration by submitting another declaration at any time.

> (2) These declarations are to be notified to the depositary and are to state expressly the territorial units to which the Convention extends.

> (3) If, by virtue of a declaration under this article, this

19

Convention extends to one or more but not all of the territorial units of a Contracting State, and if the place of business of a party is located in that State, this place of business, for the purposes of this Convention, is considered not to be in a Contracting State, unless it is in a territorial unit to which the Convention extends.

(4) If a Contracting State makes no declaration under paragraph (1) of this article, the Convention is to extend to all territorial units of that State.

CISG, *supra,* art. 93.

## A. Territorial Units Under Article 93(1)

Currently, Hong Kong and Macao enjoy constitutional independence from China under Article 31 of China's Constitution, which permits China to establish Special Administrative Regions.  *See* Schroeter, *supra,* at 321.  Pursuant to its Basic Law, Hong Kong enjoys a high degree of autonomy and independent executive, legislative and judicial power.  *See* XIANGGANG JI BEN FA art. 2; *see also* Schroeter, *supra,* at 322.  Macao enjoys the same autonomy under Article 2 of its Basic Laws.  *See* Zhonghua Renmin Gongheguo Aomen Tebie Xingzhengqu ji ben fa (The Basic Law of the Macao Special Administrative Region of the People's Republic of China) art. 2.  Given that different legal systems apply to the sale of goods in China's territorial units (Mainland China, Hong Kong, Macao), China falls within the scope of Article 93(1).

## B. Declaration Requirement Under Article 93(1)

Before China resumed sovereignty over Hong Kong (and Macao), however, Article 93 of the CISG had no practical effect on China because China had no "territorial units.""  In other words, when I-long Kong became an SAR', China for the first time fell within Article 93(1).  The parties dispute what effect Hong Kong's becoming a SAR had under the CISG.

Article 93(1) permits a Contracting State with more than one territorial unit to declare "at the time of signature, ratification, acceptance, approval or accession" that the CISG is to extend to one or more of its territorial units. CISG, *supra,* art. 93(1).  Of course, China could not make an Article 93 declaration at the time it signed the CISG because Article 93

did not pertain to China at that time. While Article 93(1) does not expressly address the situation where, as here, a State gains control over a territorial unit after ratification of the CISG, reading the CISG to limit Article 93(1) declarations to those times specifically mentioned (signature, ratification, acceptance, approval or accession) would render a declaration by China impossible.  Article 93(1) does, however, allow a Contracting State to "amend its declaration by submitting another declaration at any time." A plain reading of this provision of the treaty permits China to make an Article 93(1) declaration regarding the status of its territorial units after gaining control of those territorial units.  *See generally* Schroeter, *supra,* at 323-326.  Accordingly, the Court finds that China falls under the provisions of Article 93, and that China had the legal opportunity to declare that the CISG should not extend to the Hong Kong SAR when it resumed sovereignty over Hong Kong.

**1. Letter of Notification of Treaties Applicable to the Hong Kong SAR**

Having established that the CISG permitted China to make an Article 93 declaration regarding Hong Kong, the Court must determine if China did so.  An Article 93(1) declaration, as defined in Article 93(2), is to be "notified to the depositary and [is] to state expressly the territorial units to which the Convention extends."  CISG, *supra,* art 93(2).  Defendants argue that a letter the Chinese government deposited with the Secretary-General of the United Nations after resuming sovereignty of Hong Kong qualifies as an Article 93( I) declaration.  *Letter of Notification of Treaties Applicable to Hong Kong after* 1 *July 1977,* Deposited by the Government of the People's Republic of China with the Secretary-General of the United Nations, June 20, 1997, 36 I.L.M. 1675 (hereinafter "Notification Letter" or "Letter").  This Notification Letter lists the treaties China applied to the Hong Kong SAR, without mentioning the CISG.  *See Notification Letter,* 16 I.L.M. at 1676-91; Schroeter, *supra,* at 315.  Defendants allege that China's omission of the CISG in this letter serves as a declaration that the C1SG is not to extend to the Hong Kong SAR. (R. 162-1; Defs.' Resp. at 4.)

To constitute an Article 93 declaration, the Notification Letter must satisfy the two requirements provided by Article 93(2). First, the declaration must be notified to the Secretary-General of the United Nations, who is the depositary of the CISG.  In China's case, the Notification Letter satisfies this requirement because the Chinese government deposited it with the Secretary-General of the United Nations after resuming sovereignty of

Hong Kong.  Second, the declaration must expressly identify the territorial units to which the CISG extends.  Here, the Notification Letter fails.  The Notification Letter is far from an express statement that the treaty requires of an Article 93(J) declaration.  Rather, the Letter merely lists some treaties which China determined should apply to Hong Kong.  The Letter says nothing with respect to the C1SG, and clearly does not "state expressly the territorial units to which the Convention extends."  As such, China's Notification Letter docs not constitute an Article 93 declaration.

Moreover, Defendants' argument that the Notification Letter' constitutes an Article 93 declaration presumes that the Letter represents an exhaustive and definitive list of the treaties China applied to Hong Kong; an argument the Notification Letter itself contradicts.  The Letter states that the Chinese government will separately carry out the formalities for any treaty that is not listed which it decides to apply to Hong Kong.  *Notification Letter,* 36 l.L.M. at 1676, § IV.  It then declares that no separate formalities are needed "with respect to treaties which fall within the category of foreign affairs or defence or which, owing to their nature and provisions, must apply to the entire territory of a State." *Id.*  This language undermines Defendants' argument that the Notification Letter evidences China's intent not to apply the C1SG to Hong Kong.

Only one case, recently decided by the Supreme Court of the Republic of France, has directly addressed the applicability of the CISG to Hong Kong.  *See* Cour de Cassation premiere chambre civile [Supreme Court, 1st Civil Chamber], April 2, 2008, No. 04-17726, *translated at:* <http://cisgw3.law.pace.edu/cases/080402fl.html> (hereinafter *"French Case").*  In its opinion, the Supreme Court of France reaches the opposite conclusion and finds that the CISG does not extend to Hong Kong.  A close examination of the French Supreme Court's reasoning, however, supports this Court's conclusion that the ClSG does in fact apply to the Hong Kong SAR.

Defendants rely heavily on the *French Case* as persuasive authority.  (R. 162-1; Defs.' Resp. at 2.)  In that case the buyer, a French company, asserted that the ClSG controlled the sale of goods by the seller, a Hong Kong company.  The buyer alleged that the CISG applied because Hong Kong is a region of China and because China, a signatory to the treaty, did not make an Article 93 declaration restricting the application of the CISG to Hong Kong.  *French Case, supra.*  The Supreme Court of France disagreed with the buyer and held that the CISG does not apply to Hong Kong.  In its

opinion, the Supreme Court of France characterized the Notification Letter as "a formality equivalent to what is provided for in Art. 93, CISG." *French Case, supra.* Because the court equated the Notification Letter with a declaration, it concluded that China's failure to list the CISG on the Letter's list of applicable treaties was determinative. For the reasons discussed above, however, the Court does not conclude that the Notification Letter constitutes a declaration under Article 93. Respectfully, the Court believes that the Supreme Court of France overlooked the declaration requirements in Article 93(2) in reasoning that the Notification Letter qualifies as a declaration. Moreover, the Court finds persuasive the language in the Notification Letter noting that China could later name treaties which would apply to Hong Kong. Accordingly, this Court is not persuaded by the French Court's decision.

## 2. Effect of the Lack of a Declaration under Article 93(1) of the CISG

When a Contracting State with two or more territorial units does not make a declaration under Article 93(J) of the CISG, the Convention extends to all territorial units of that State pursuant to Article 93(4). CISO, *supra,* art. 93(4). This provision clearly and expressly states that the CISG will automatically apply to all units of a Contracting State where the Contracting State fails to make an Article 93(1) declaration. Applying the CISG to all territorial units is therefore the default and, as Plaintiff correctly argues, a State must affirmatively opt-out of the ClSG on behalf of one or more of its territories in order to avoid this provision. (R. 164-1; Pl.'s Reply at S.); *see* Schroeter, *supra,* at 325. As the Court concluded above, China did not make an Article 93(1) declaration. In the absence of such a declaration, Article 93(4) automatically extends the CISG to China's territorial units, including Hong Kong. *See* Schroeter, *supra,* at 325.

The language of these ClSG provisions is clear and unambiguous when read in context and is therefore binding. Based on the plain language of the treaty, the Court concludes that the CISG applies to the Chinese Special Administrative Region of Hong Kong. *See United States v. Duarte-Acero,* 208 F.3d 1282, 1285 (11th Cir. 2000) ("If the language of the treaty is clear and unambiguous, as with any exercise in statutory construction, our analysis ends there and we apply the words of the treaty as written.").

## III. The Department of Justice of Hong Kong

Defendants advance the fact that the Department of Justice for Hong Kong does not list the CISG as a treaty to which it is bound. (R. 162-J; Defs.' Resp. at 4,5.)  While the Court finds this fact initially persuasive, it is not determinative.  Importantly, because China is a party to the CISG, the Chinese government holds the authority to extend the ClSG to Hong Kong. *See supra* Part I; Joint Declaration, *supra,* § XI.  Although the Department of Justice for Hong Kong does not list the treaty on its List of Treaties in Force and Applicable to the Hong Kong Special Administrative Region, it is ultimately China's decision.  As discussed above, under the unambiguous language of the treaty, China's failure to make an Article 93 declaration exempting Hong Kong from the CISG triggers the default application rule of Article 93(4).

**IV. Policy Considerations**

Plaintiff raises persuasive policy considerations in favor of its contention that the CISG should apply to the Hong Kong SAR. Specifically, Plaintiff notes that the CISG drafters' goal was to remove legal barriers in international trade. CISG, *supra,* Annex I; (*see* R. 158-1; PI. 's Mem. on Choice of Law at 9.)  In 2006, Hong Kong's total merchandise trade amounted to U.S. $658 billion, making it the world's twelfth largest trading entity.  *See* World Trade Organization, Leading Exporters and Importers in World Merchandise Trade (2006), Table 1.8.  In light of Hong Kong's status as a major leader in international trade and as a territorial unit of the Contracting State of China, these policy considerations further support the plain reading of the Treaty that the CISG applies to Hong Kong.

**CONCLUSION**

Because the language of Article 93 of the CISG is clear and unambiguous, the Court concludes that the CISG applies to the Hong Kong SAR.  As a company with its place of business in Hong Kong, Defendant Kelon International is therefore subject to the CISG.  All parties to the contract have their places of business in different Contracting States under the Convention, so the CISG is the applicable law in this case.

*CNA International v. Guangdon Kelon Electronical Holdings, et al*., No. 05 C 5734

(N.D.Ill. filed Sept. 3, 2008) (footnotes omitted).

IT IS SO ORDERED this 19th day of August 2010.

<u>/s/Susan Webber Wright</u>
United States District Judge